Upon review of the competent evidence of record with respect to the errors assigned, and finding no good grounds to receive further evidence or rehear the parties or their representatives, the Full Commission modifies and affirms the Opinion and Award of the Deputy Commissioner.
 ***********
Plaintiff has filed a Motion for Leave to Re-Open the Record in this case. In the discretion of the Full Commission, plaintiff's motion is denied.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties hereto are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer at all relevant times.
3. Plaintiff's average weekly wage was $448.00.
4. Plaintiff suffered a compensable injury as a result of an occupational disease on or about 22 March 1994, involving her right foot. The claim was accepted as compensable.
5. All medical records can be admitted into evidence subject to the right of either party to depose the treating physician.
 ***********
The Full Commission finds as facts the following:
 FINDINGS OF FACT
1. Plaintiff is a married woman born on 17 March 1954. She graduated from high school.
2. Plaintiff began working for defendant employer in 1973. She left defendant's employ in 1981, then returned in 1984. Plaintiff left again in 1990, but continued to work for defendant part-time. She returned to full time work for defendant in 1992. Several months later, she became a "utility person," a job which involved being proficient in all the jobs in her department. Plaintiff would fill in where necessary and assist in the training of new employees. She continued as a utility person until 22 March 1994. Plaintiff's average weekly wage at this time was $448.00.
3. Sometime before March 1994, plaintiff began to experience pain in her right foot. She was ultimately diagnosed as having a Morton's neuroma, which defendants accepted as an occupational disease sustained on 22 March 1994. On 10 May 1994, Dr. Donald B. Glugover performed an excision of the interdigital (between the third and fourth toes) neuroma of plaintiff's right foot.
4. Plaintiff returned to work on 11 July 1994, working approximately four hours a day.
5. On 26 September 1994, a Form 21 Agreement was filed, whereby defendants agreed to pay weekly compensation in the amount of $298.69, based on an average weekly wage of $448.00. The Agreement was approved by the Commission on 11 October 1994.
6. Plaintiff continued to experience pain in her right foot. She presented to Dr. J. Alfred Moretz who referred her to Sports Orthopedic Rehabilitation Center. Plaintiff participated in physical therapy during the month of September.
7. On 24 October 1994, Dr. Moretz took plaintiff out of work because of her complaints of pain, the pathology of which was not understood, and referred her to psychologist, Dr. D. Scott Cutting. Over the next several months, plaintiff was seen by orthopedic surgeons, Drs. W. Hodge Davis and Robert D. Tisdale, neurologist, Dr. Thomas J. Fox, and psychologist, Dr. Cutting. On 2 February 1995, Dr. Davis performed a resection of recurrent neuroma on plaintiff's right foot.
8. On 20 March 1995, plaintiff returned to work in the tag room, a different position for her. Her job consisted of sorting papers, or tags, hand stamping papers, and stapling papers. The job was a regular position with defendant-employer. Plaintiff was allowed to either stand or sit while performing the job. Plaintiff continued to work in the tag room at the time of the hearing before a deputy commissioner in February 1997, but was working only between two to four hours per day, five days a week.
9. On 20 March 1995, plaintiff also began daily participation in physical therapy at the Burke Rehabilitation Center. On 30 March 1995, she presented to Dr. Paul Jaszewski, an anesthesiologist and pain management specialist, at the Pain Management Center at the orthopaedic hospital in Charlotte. Plaintiff complained of a persistent burning in her right foot, swelling, bluish discoloration and hypersensitivity in her right foot, with pain radiating into her calf. Dr. Jaszewski diagnosed plaintiff as having reflex sympathetic dystrophy ("RSD").
10. Dr. Jaszewski next saw plaintiff on 11 April 1995. Her condition had not changed. He performed a sympathetic block, which completely relieved plaintiff's pain, a result which was consistent with a diagnosis of RSD. He placed plaintiff in an inpatient program of physical therapy. Some improvement was gained initially, but thereafter plaintiff's complaints worsened.
11. On 18 May 1995 Dr. Jaszewski tried a second block which was a good sympathetic block but did not significantly reduce her pain. This could mean that plaintiff's problem was not RSD, was RSD which was no longer responding to blocks, or that plaintiff's pain was exaggerated. A functional capacity exam was performed and, based on the results, Dr. Jaszewski released plaintiff to return to light duty work, four to six hours a day, with restrictions that fell within the parameters of her job in the tag room.
12. Plaintiff continued to see Dr. Davis, who also recommended that plaintiff to return to work for six hours per day for six weeks, then increase to eight hours per day. Plaintiff did not comply with these recommendations and, at the time of the hearing before the deputy commissioner, continued to limit her working hours to four or less hours per day.
13. On 19 September 1995, Dr. Jaszewski noted that plaintiff was improving and she was not displaying symptoms of RSD, yet her complaints of pain had not decreased. On 27 September 1995, Dr. Jaszewski again noted that plaintiff's foot appeared almost normal and showed no signs of RSD. Nevertheless, she continued to complain of significant pain. A diagnostic spinal block provided complete relief of pain for a short period of time, which would indicate that her pain was not RSD but was somatic pain related to the original neuroma and surgery. On 17 October 1995, Dr. Jaszewski found that plaintiff was at maximum medical improvement and gave her a rating of twenty percent permanent partial disability in her right foot, in accordance with the findings of Dr. Davis.
14. Dr. Jaszewski last saw plaintiff on 8 April 1996. He found no dramatic changes in her condition and a fairly normal appearing right foot. Plaintiff complained of low grade pain in her left foot and upper extremities as well as the ongoing right foot pain, which Dr. Jaszewski attributed to neuritis. He had no medical explanation for the left foot and upper extremity complaints. He recommended that plaintiff attempt to increase her hours of work and stated that her condition should not interfere with her performance of the tag room job.
15. On 24 April 1996, plaintiff presented to neurologist Dr. W. Michael Nesbit. Dr. Nesbit diagnosed mild RSD and myofascial pain of the right foot and depression. He determined that plaintiff's left foot and upper extremity problems were the result of a combination of poor posture, dysfunctional gait, and deconditioning, indirectly the result of the compensable foot injury because of her inactivity and disuse of the right foot. Plaintiff's major problem was deconditioning, and he recommended increased activity and psychologic treatment. He did not believe she was at maximum medical improvement.
16. Dr. Nesbit next saw plaintiff on 30 May 1996. She complained of right shoulder pain and left hand tingling and numbness. A detailed neurological and musculoskeletal examination showed a normal upper extremity, negative Phalen's, no sensory deficit, and normal strength. Regarding the lower extremities, she limited her weight bearing on the right foot and displayed inconsistent give way weakness, with normal strength at times. There was no muscle atrophy to the feet and no symptoms of RSD. Plaintiff had some sensory loss to the right toes consistent with the neuroma surgery.
17. On 30 May 1996, Dr. Nesbit noted a repeat dramatic inconsistency in a Hoover test for leg strength, indicating a conscious effort to deceive the examiner. He diagnosed the inter-digital neuroma of the right foot with myofascial pain. He further stated that she had had thorough diagnostic testing and treatment for her problems and that she was at maximum medical improvement with a 10% impairment to the right foot. He released her to return to work full time at eight hours per day in a sedentary job which would not involve being on her feet continuously more than two of the eight hours.
18. On 22 May 1997, plaintiff again saw Dr. Nesbit, who conducted a thorough evaluation of plaintiff's condition at the request of the rehabilitation consultant, Ms. Lipscomb. Plaintiff advised Dr. Nesbit that her attempt to return to work for 8 hours had caused her to develop forearm and finger tingling, coldness, and pain. He noted that Dr. Poehling had seen plaintiff on 5 May 1997, had found dystrophic response in her right upper extremity, and had stated that she should not be doing highly repetitive work. Dr. Nesbit further noted that Dr. Cutting, plaintiff's psychologist, had recommended that plaintiff stop working in order to avoid increasing her pain. Plaintiff was then working 2 or 3 hours a day and stated her desire for a wheelchair.
19. Dr. Nesbit found plaintiff's upper extremities to be normal and her right foot to be cool and pale. Plaintiff would not allow him to touch her foot except very briefly, but he expected there to be some mild muscle atrophy from disuse. Otherwise, strength overall was good. He diagnosed complex regional pain syndrome of the right foot, no abnormalities to the upper extremities, and depression. He stated that she was not at maximum medical improvement because of her depression and deconditioning, but he did agree that her impairment rating would remain at 20% to the right foot. He recommended that she continue psychological treatment with Dr. Cutting so long as Dr. Cutting would agree to Dr. Nesbit's prescription that she continue regular work. He also recommended evaluation and treatment by Dr. Stutesman.
20. On 23 June 1997, a deputy commissioner entered an interlocutory order approving Dr. Nesbit as plaintiff's treating physician, and plaintiff was ordered to cooperate with an examination by Dr. Stutesman.
21. Plaintiff presented to Dr. Stutesman on 9 July 1997. She diagnosed plaintiff with status post Morton neuroma with excision, a complex regional pain syndrome type I, and right pectoralis minor syndrome. There were no nerve changes creating the problem, and Dr. Stutesman determined that the problems stemmed from plaintiff immobilizing her foot and the resulting abnormal posture. She recommended aggressive range of motion exercises, strengthening of the upper back muscles for the upper extremity problems, and normalizing plaintiff's gait for the lower extremity condition.
22. Dr. Stutesman noted some symptom magnification on the initial visit and specifically pointed to the lack of atrophy in the extremities, indicating the muscles were being used. There was no consistency between the physical exam and plaintiff's contentions regarding her limitations. Dr. Stutesman recommended a neuromuscular stimulator to decrease pain, and physical therapy for two weeks, including water therapy.
23. By 19 August 1997, Dr. Stutesman noted improvement, including the fact that plaintiff was turning her right foot outward less. Therapy reports indicated that plaintiff was now able to use the ladder to get in and out of the pool. Based on the receipt of a job evaluation for the tag room job, Dr. Stutesman recommended that plaintiff increase her hours to four hours a day for two weeks, then five hours for two weeks. Plaintiff did not comply with this recommendation.
24. On 16 September 1997, plaintiff presented to Dr. Stutesman with complaints that the water therapy was no longer helping. She reported that she had been to see Dr. Poehling, who recommended that she increase her work hours from four to six hours per day and discontinue the water therapy. Dr. Stutesman noted that plaintiff's gait had improved and there was no physical reason why plaintiff could not put full weight on her right foot. She allowed plaintiff to discontinue the water therapy and recommended that plaintiff return to work at five hours a day to be increased by one hour a day each week until she reached eight hours. As of this time, Dr. Stutesman noted no evidence of regional pain syndrome, and she gave plaintiff a rating of twenty percent permanent partial disability to her right foot as the result of the surgeries.
25. Plaintiff presented to Dr. Gary Poehling on 12 December 1996 for a second opinion following the diagnosis of Dr. Nesbit. Dr. Poehling described no objective abnormalities other than that the right foot was significantly cooler than the left, but he indicated that his opinion was that plaintiff had a fifty percent permanent partial disability rating as a result of RSD, a form of complex regional pain syndrome. He recommended that plaintiff be as active as possible but approved a modified work schedule.
26. Dr. Poehling next saw plaintiff on 5 May 1997 for complaints of pain in her upper extremity. He diagnosed upper extremity dystrophic response and a severe disability in the right foot. He recommended work restrictions of light duty, less than five pounds lifting, no repetitive use of the right extremity, and no vibrating tools.
27. Dr. Poehling next saw plaintiff on 4 September 1997. He diagnosed complex regional pain syndrome in both the upper and lower right extremities. He recommended that plaintiff increase of her visits to Dr. Cutting and continue to work on light duty with no repetitive motion of the right extremity, thereby allowing her to increase her work time from four to six hours per day. It is at this meeting that he recommended discontinuance of the water therapy.
28. In deposition, Dr. Poehling testified that he had no indication from the reports of plaintiff's other physicians that she received incompetent care, and he agreed that all treatment recommendations were correct. Dr. Poehling had no suggestions for alternative therapy or treatment. After reviewing Dr. Nesbit's reports, Dr. Poehling stated that he had no reason to believe Dr. Nesbit could not treat plaintiff competently.
29. Plaintiff's condition is the result of her failure to comply with the treatment recommendations of her physicians that she increase her level of activity, including increasing the number of daily hours she works at her job. The tag room position did not aggravate or contribute to her continuing complaints of pain, and she is physically able to perform the tasks of the job. The primary reason for her condition is inactivity and resulting deconditioning.
30. Plaintiff's upper extremity complaints are not medically substantiated and are not caused by the compensable foot injury. The tag room position did not cause plaintiff's upper extremity pain.
31. The physicians' findings of various points of maximum medical improvement in this case demonstrate how plaintiff's self-limitations on her physical activity have worsened her condition and prevented her recovery. These self-limitations were out of proportion to her pain and were unjustified. Plaintiff did not demonstrate a motivation to improve. She did not demonstrate a willingness to return to work full time in the tag room or in any other available light duty positions. Absent her self-imposed limitations, plaintiff likely would have improved and would have been able to return to work full time. Given plaintiff's noncompliance, it is unlikely that further medical intervention will improve her condition.
32. Plaintiff reached maximum medical improvement no later than 16 September 1997. She has a permanent impairment rating of 20% to her left foot.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff unjustifiably refused to comply with her physicians' recommendations that she increase her level of activity, including her work hours, in order to improve; therefore, her eligibility for wage loss compensation under the Act is suspended as of 16 September 1997. G.S. § 97-25, § 97-32.
2. Plaintiff is not entitled to payment for medical treatment after 16 September 1997 due to her refusal to comply with the treatment instructions of her physicians to increase her physical activity, including work activity. Absent such compliance, further medical treatment is unlikely to effect a cure, give relief, or lessen the period of disability. G.S. § 97-25.
3. In order to reinstate benefits, plaintiff must comply with the following work schedule: Plaintiff must begin working four hours a day regularly for a period of two weeks, then increase her daily work schedule by one hour each successive week until she reaches a regular schedule of eight hours per day. G.S. § 97-25.
4. For plaintiff's 20% permanent partial disability rating to her right foot, plaintiff is eligible for compensation in the amount of $298.69 per week for a period of 28.8 weeks. G.S. § 97-31(14).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 ORDER AND AWARD
1. Plaintiff's motion to change treatment to substitute Dr. Poehling as plaintiff's authorized treating physician is denied.
2. Defendants shall pay plaintiff compensation in the amount of $298.69 per week for a total of 28.8 weeks for the 20% percent permanent partial disability to her right foot. The payment shall be made in a lump sum, subject to reasonable attorney's fees as discussed below.
3. Plaintiff's counsel is entitled to a reasonable attorney's fee of twenty-five percent of plaintiff's compensation paid pursuant to Paragraph 2.
4. Defendants shall pay the costs.
 S/ _____________ RENÉE C. RIGGSBEE COMMISSIONER
CONCURRING:
S/ _____________ LAURA K. MAVRETIC COMMISSIONER
S/ _____________ THOMAS J. BOLCH COMMISSIONER